# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | 2:19-cr-00192-MAK |
| | : | |
| RANDY LEE SWACKHAMMER | : | |

## SENTENCING MEMORANDUM

Defendant Randy Lee Swackhammer, by and through counsel, respectfully submits this Sentencing Memorandum setting forth his position on the factors that the Court will consider in determining his sentence.

### SENTENCING FACTORS

Mr. Swackhammer has accepted responsibility for his crime and is prepared to accept this Court's judgment. A careful review of the facts of this case, the advisory Sentencing Guidelines, and the relevant statutory considerations demonstrates that a non-custodial sentence is sufficient, but not greater than necessary to serve the purposes of sentencing.

I. **Application of Advisory Sentencing Guidelines**

Mr. Swackhammer does not contest the calculation of the advisory guideline sentence contained in the final presentence report. As indicated in Part E of the report, there are several factors that warrant a downward departure in this case, as detailed further below.

a. *Substantial Assistance to Authorities §5K1.1*

The details of Mr. Swackhammer's initial meetings with the government, and his acceptance of responsibility for his crime are set out in detail in the presentence

report.  PSR ¶¶ 26-33, 36.  But Mr. Swackhammer's efforts at cooperation go far beyond those initial communications.

From 2018 to the present, Mr. Swackhammer has met with the government, either in person or telephonically on countless occasions.  While some of those conversations included counsel, more often Mr. Swackhammer has worked directly with federal agents to aid them in their ongoing investigations.  For example, in addition to the interviews detailed in the presentence report, agents from the FBI and HHS traveled to North Carolina to meet with Mr. Swackhammer in person on at least three occasions to debrief him and to get his assistance with collecting additional information about how these telemedicine schemes worked.  At the direction of the agents, Mr. Swackhammer made requests of information from telemedicine providers to allow the government to gain greater insight into their operations.  The assistance Mr. Swackhammer provided lead to the issuance of at least one search warrant and, to the understanding of counsel, has been beneficial in a number of additional matters.  He has also met with the prosecution team working on the investigation of a telemedicine provider in the District of New Jersey—providing them substantial information during the course of a debriefing, as well as offering to conduct additional proactive cooperation.

In addition to working with federal agents to advance their investigation into multiple fraudulent telemedicine schemes, Mr. Swackhammer has been identified as a potential witness in multiple telemedicine fraud prosecutions.  For example, Mr. Swackhammer met with prosecutors on two occasions to prepare for his

testimony in the matter of *U.S. v. Hagen*, 3:19-CR-146 (N.D. Texas 2019). While he ultimately was not called to testify, counsel for the government found him credible and helpful to their trial preparation. Mr. Swackhammer was also identified as a potential witness in a telemedicine fraud case in the Middle District of Florida where the defendant has not entered a guilty plea—*U.S. v. McNeal, IV*, 8:19-CR-146 (M.D. Florida 2019).

In sum, Mr. Swackhammer has done all he can to set right what he has done wrong. He has taken that obligation seriously. And, as he comes before the Court for sentencing, Mr. Swackhammer remains, ready, willing, and able to continue assisting the government in any way, at any time.

b. *Military Service §5H1.11*

Mr. Swackhammer served in the U.S. Army Reserve from 1981 to 1985, and then as an active duty member from 1985 to 1992, at which point he was honorably discharged, having attained the rank of Major. PSR ¶ 88. Mr. Swackhammer takes great pride in his military service, as he should. His time in the Army took him into combat with the 82nd Airborne Division of the U.S. Army during Operation Desert Storm, and his actions in theater lead to him receiving, among other recognitions, the Combat Medical Badge and the Meritorious Service Medal. Mr. Swackhammer's service to his country, and to his fellow soldiers, was exceptional and merits consideration by this Court as it considers the appropriate sentence.

    c.  *Mental and Emotional Conditions §5H1.3*

The Army was very good to Mr. Swackhammer. In addition to providing an outlet for his deep and abiding love of country, the Army funded and facilitated his medical training. But, his service was not without cost. Mr. Swackhammer was first diagnosed with depression and hospitalized in 1985, in the wake of a failed suicide attempt during the course of his medical residency. Also, in 2014, Mr. Swackhammer was diagnosed with PTSD, stemming in large part from the trauma of his experiences during Operation Desert Storm. To this day, Mr. Swackhammer participates in therapy with Dr. Meredith Godwin and is on a regime of medications to help stabilize his mental health. He also regularly meets with Jennifer Smith, a substance abuse counselor in Dr. Godwin's office, to address any concerns arising from Mr. Swackhammer's history of alcohol abuse.

The issues arising from his time in the military are also doubtless rooted in his childhood. Mr. Swackhammer is the product of a broken home, in which his father was either absent or abusive. While Mr. Swackhammer was able to overcome the physical and material challenges of his childhood, the mental and emotional scars abide. His suicidal thoughts began in high school, and have persisted to the present, as evidenced by the letter submitted to the Court by his wife, Lydia. They are accompanied by depression, anxiety, and panic attacks.

It will be extremely difficult for the BOP to adequately manage Mr. Swackhammer's mental health issues, especially at a time when the BOP is continuing to combat the challenges presented by the pandemic. Since March 13,

2020, BOP "modified its operations" to respond to the spread of COVID-19. BOP's website currently states that inmate movement is authorized to permit showers three times a week, telephone and email access, commissary, and laundry, but is otherwise limited. Having Mr. Swackhammer serve a period of incarceration in at or near conditions of isolation is especially concerning, given his history of suicidal thoughts, including an attempt to take his own life. A non-custodial sentence will allow Mr. Swackhammer to continue receiving the mental health care that he needs.

*d. Physical Condition §5H1.4*

The presentence report spells out in detail the litany of physical ailments that plague Mr. Swackhammer. PSR ¶¶ 79-80. Unquestionably, it would be difficult for any BOP facility to adequately care for his physical needs in the best of times. Owing to the pressures placed on the BOP by COVID-19, these are not the best of times. At this point in his life, Mr. Swackhammer requires near constant medical care. It will be nearly impossible for any BOP facility to provide care commensurate with his needs,

**II.    Statutory Sentencing Factors**

The Court is well aware of its duty to craft a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). In this unique matter with this unique defendant, the key sentencing factors identified in Section 3553 call for a non-custodial sentence.

a. *History and Characteristics of the Defendant*

The basic facts of Mr. Swackhammer's life are set forth in detail in the presentence report. But, the character reference letters provided by his friends and family members really bring to life the challenges, accomplishments, and character of Mr. Swackhammer. In describing Mr. Swackhammer, James Kelley comments "He was known in this community as a gentleman who loved people and his patients." William Ordelt echoes this sentiment in describing Mr. Swackhammer as "my friend in the highest sense of the word – one in whom I trust and admire and revere. He can be nothing less." May we all be so lucky to have someone think as much of us as these people think of Mr. Swackhammer.

b. *Nature of the Offense*

The conspiracy in which Mr. Swackhammer was involved resulted in over $3,000,000 of reimbursements from federal healthcare programs to companies that sought to profit from their lies. Mr. Swackhammer played a critical, if relatively minor, role in that conspiracy. Without his authorization, these payments would not have been made. But, it is important to note that Mr. Swackhammer's total gain from the offense was $139,000.00. Also of note, most of the proceeds Mr. Swackhammer received for his role in the offense were subsequently used to pay out bonuses to the staff in his medical practice in Goldsboro, not to line his own pockets. This is offered not to excuse Mr. Swackhammer's conduct, but merely to show that even in committing this crime, Mr. Swackhammer was not motivated by mere personal gain and greed.

### c. Deterrence

The need to deter Mr. Swackhammer from additional offenses is non-existent. His record as a citizen speaks for itself, and the likelihood of his committing another offense is zero. This is owing in large part to what he has already lost from this offense—his medical practice, his medical license, his unblemished record as a citizen, and, in no small part, his self-respect. As detailed in the letters submitted to the Court by his friends and family—most notably his wife—the stress and strain of the past two years has taken an incredible toll on Mr. Swackhammer physically, mentally, and emotionally.

Mr. Swackhammer's experience with telemedicine is a cautionary tale, and one he is prepared to share with other physicians. He intends to work in concert with the North Carolina Board of Medicine to share his story with other physicians, so they can see first-hand the profound negative impacts that can and will flow from a failure to maintain the highest professional standards. In that, Mr. Swackhammer himself will be a powerful source of deterrence to others who may seek to abuse the telemedicine system.

### d. Need to avoid unwarranted sentencing disparities

Mr. Swackhammer's presentence report identifies a number of related cases, including the prosecutions of John Krawczyk, Esther Diller, Michelle Cuttino,[1] and Herb Kimble. Mr. Krawczyk and Ms. Diller have already been sentenced by this Court. Mr. Krawczyk was sentenced to one day of incarceration, followed by three

---

[1] Information regarding Ms. Cuttino's case is not presently available through the PACER or CM/ECF systems.

years of supervised release, including 30 hours of community service, and a $50,000 fine.² Ms. Diller was sentenced to three years' probation and a $50,000 fine. Mr. Kimble is awaiting sentencing in the District of South Carolina. Notably, he has entered into a plea agreement that requires him to pay $40,000,000 of restitution, which will fully satisfy the join and several restitution obligations of Mr. Swackhammer.

While each case has its own nuances and each defendant's circumstances must be evaluated independently, it appears that Mr. Swackhammer is similarly situated to the two defendants this Court already has sentenced in connection with this telemedicine scheme. As such, a non-custodial sentence would be the best path to avoid unwarranted sentencing disparity.

   e.  *Kinds of sentences available*

This Court has a range of non-custodial options available to it that will satisfy the purposes of punishment without exposing Mr. Swackhammer to a period of incarceration that may disproportionally impact him.³ Pursuant to 18 U.S.C. § 3561(c)(1), this Court may sentence Mr. Swackhammer for a period of one to five years' probation. The Court may further order that some portion of that probationary sentence be served in home detention, and that Mr. Swackhammer be subject to other restrictions that the Court deems appropriate. This could include anything from prohibiting him from seeking to reinstate his medical license to

---

² Mr. Krawczyk and Ms. Diller were also ordered to forfeit $794,000 in installment payments. Mr. Swackhammer's plea calls for him to pay $139,000 in forfeiture, which he intends to pay in full either before, or immediately after, sentencing.

³ In addition to the potential acute mental and physical health impacts that a period of incarceration may have on Dr. Swackhammer, he would lose a portion of his veterans benefits for the period of incarceration and could lose them permanently.

restricting his access to television and the internet. Put simply, the Court has the opportunity to tailor a sentence that meets the distinct demands for justice and mercy called for in this case.

## CONCLUSION

For the reasons detailed above, Randy Swackhammer respectfully requests a non-custodial sentence in this matter.

Dated:  July 19, 2021.	Respectfully submitted,

s/ *Wes J. Camden*
WES J. CAMDEN

*Of the North Carolina Bar 33190*
*Admitted Pro Hac Vice*
Williams Mullen
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
Telephone: (919) 981-4064
Facsimile: (919) 981-4300
wcamden@williamsmullen.com

JAMES A. BACKSTROM
*Of this Bar and Pennsylvania 24523*
1515 Market Street, Suite 1200
Philadelphia, PA 19102-1932
Telephone: (215) 864-7797
jabber@backstromlaw.com

*Counsel for Defendant*
*Randy Lee Swackhammer*

## CERTIFICATE OF SERVICE

I, Wes J. Camden, hereby certify that on this July 19, 2021, I caused the foregoing Sentencing Memorandum on behalf of Defendant Randy Lee Swackhammer to be filed via the Court's CM/ECF System upon Debra Jaroslawicz, government counsel of record.

s/ *Wes J. Camden*
WES J. CAMDEN
